**McKEE–BERGER–MANSUETO, INC., Plaintiff-Appellee, Cross-Appellant,**

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant-Appellant, Cross-Appellee.**

**Nos. 79–1369, 79–1370.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1979.

Decided July 16, 1980.

Rehearing and Rehearing En Banc Denied Sept. 3, 1980.

---

Edward C. Peterson, Asst. Atty., Law Dept., Bd. of Ed., Chicago, Ill., for defendant-appellant, cross-appellee.

Herbert Morton, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before PELL and SPRECHER, Circuit Judges, and ACKERMAN, District Judge.*

PELL, Circuit Judge.

This appeal by the Board of Education of the City of Chicago (the Board) challenges the district court judgment that the Board pay McKee-Berger-Mansueto, Inc. (MBM) $416,976.54 in damages for amounts found to be due and owing under a contract between the parties. The Board raises numerous issues on appeal. The undisputed facts as found by the district court are as follows.

In October of 1973, MBM and the Board entered into a contract whereby MBM was to provide construction management services for the Board's 250 million dollar school rehabilitation program. Due to the requirements of Illinois law, the contract was to run from year to year with the Board having the right of renewal. The Board's exercise of the right was "not due until 30 days after the adoption of the annual budget." This date normally occurs on August 31 of each year.

The relationship between the parties remained amicable, MBM providing the management services and the Board paying, with minor deductions, all bills presented, until September of 1975 when Joseph Hannon succeeded James F. Redmond as Superintendent of the Board. At that time, Hannon wrote to MBM questioning various billing procedures and invoices previously submitted by MBM. The parties exchanged further correspondence and ultimately held a meeting on November 4, 1975, to discuss their differences. At this meeting, MBM agreed to waive until December 7, 1975, the 30-day limitation on the Board's extension privilege which otherwise had expired on August 31, 1975, and further agreed that the Board could withhold 20% of the amounts MBM billed as security until the differences between the parties were settled. Failing to achieve such reconciliation soon thereafter, MBM granted further extensions, four in total, and thus continued to perform, bill, and receive payment for its services until it finally chose to quit at the end of the final extension on June 18, 1976. Upon cessation of its performance, MBM sued the Board for the 20% of the billings withheld up to that point and for 100% of the final bill which the Board had refused to pay. After a trial on the merits, the district judge granted judgment on the contract to MBM for its claimed damages of $416,976.54. The court held, in the alternative, that if the contract were held to have expired on August 31, 1975, MBM was due the identical amount under a theory of *quantum meruit.* The court also found against the Board on its counterclaim for

* Judge J. Waldo Ackerman, District Judge for the Central District of Illinois, is sitting by designation.

funds it asserted were wrongfully billed and obtained by MBM. Each party has appealed from the judgment insofar as it is adverse to its position.

## I. THE ADMISSION OF EVIDENCE OF NONPERFORMANCE AND THE BOARD'S MOTION TO AMEND ITS COMPLAINT.

During the course of the trial and as a part of its case-in-chief, the Board sought to introduce certain evidence concerning specific allegations of nonperformance by MBM. The district judge did not admit this evidence on the ground that the Board had failed sufficiently to plead the specifics of these claims in accordance with Federal Rule of Civil Procedure 9(c).[1] The court also declined to allow amendment of the Board's answer so as to include allegations concerning the offered evidence. The Board complains here that its original answer, including the allegations made in its counterclaim which were incorporated by reference in its answer, gave MBM adequate notice of the Board's assertion of MBM's alleged nonperformance. In the alternative, the Board contends it should have been allowed to amend its pleadings. We disagree and find that the district court properly exercised its broad discretion on these issues.[2]

In its counterclaim, and thus in its answer, the Board made allegations of MBM's nonperformance referring specifically to MBM's alleged over-staffing, the billing of non-MBM employees as if they were employees, the billing of inaccurate

and inflated amounts for fringe benefit costs, inadequate typing and technical preparation of periodic reports to the Board, double billing and sundry other objections including a count stating that MBM had received 90% of the money available to it while completing only 70% of its job and, therefore, it could not have completed the job within the contractual money allowance. The evidence that was denied admission, on the other hand, concerned MBM's compliance with specific provisions of the contract; for example, MBM's obligation to maintain representatives in the Board's offices, to develop standard forms and reports, to attend meetings, to make recommendations regading supplies, advertising, and to inspect work completed.

Even a cursory comparison of what was alleged in the counterclaim and what was sought to be introduced at trial reveals there is little resemblance between the two. The Board contends that its answer and counterclaim should have put MBM on notice that it would contest the adequacy of MBM's performance, especially insofar as it "specifically" alleged the inadequacy of the "quantity" of MBM's performance. It is evident, however, that the Board is attempting improperly to treat "performance" or "quantity of performance" as generic terms and specific allegations of nonperformance as fungible items. To do so, however, simply ignores the explicit requirements of Rule 9(c) that denials of performance are to be made *"specifically and with particularity."* There were no allegations in the pleadings concerning the rele-

---

1. Fed.R.Civ.P. 9(c) provides:

   In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity.

2. The Board also argued at oral argument, although not in its brief or before the trial court, that as the allegations concerning MBM's nonperformance were contained in a counterclaim and not in an answer, they were not governed by Rule 9(c). The Board concludes, therefore, that even if the trial court was correct in refusing to admit the evidence because the

Board's answer was inadequate, the evidence should have been admitted to allow resolution of the counterclaim. We disagree. We have found no support for the contention that Rule 9(c) governs only answers and does not require specificity when allegations of nonperformance are made in counterclaims. No such authority has been suggested by counsel for the Board nor does the plain language of the Rule 9(c) suggest such a construction. The rationale of the Rule would seem applicable whether "denials" of performance were made in a responsive answer or affirmatively made in a counterclaim. We, therefore, decline to adopt the Board's suggested construction.

vant specific allegations made by the Board at trial and detailed review of the entire record reveals little or no mention of the latter allegations during any deposition or during the trial itself until the evidence was finally offered. Thus, even assuming that the Board's incorporation into its answer of the allegations made in its counterclaim was a proper procedure, *see Brause v. Travelers Fire Ins. Co.*, 19 F.R.D. 231, 234 (S.D. N.Y.1956), the offered evidence went well beyond anything mentioned in the Board's generalized pleadings. Unless we are to ignore the strictures of Rule 9, we cannot find the district court abused its discretion in this regard.[3]

■ A similar conclusion is appropriate to the Board's challenge of the district judge's denial of the Board's motion to amend its answer. It is certainly correct, as the Board points out, that amendments are appropriate to allow the pleadings to conform to the evidence admitted at trial. *See, e. g., Temperato v. Rainbolt*, 22 F.R.D. 57 (E.D.Ill.1958) *and Reynolds-Fitzgerald v. Journal Publishing Co.*, 15 F.R.D. 403 (S.D. N.Y.1954). However, the Board unfortunately engages in circular reasoning and ignores the fact that its evidence was *not* admitted at trial for the very reason that it was *not* adequately pleaded. The Board's attempted bootstrap argument also ignores the obvious prejudice to plaintiffs had the amendment been allowed, as was requested, after both sides had rested their cases-in-chief. Three of MBM's most essential witnesses in this area, Mattox, the Board's official most directly responsible for the rehabilitation program, and Thomas and Zanchettin, MBM project managers for the program, were all well beyond the district court's jurisdiction and declined or were unable to make themselves available to plaintiffs for trial. This fact was known to the parties and thus these individuals' depositions were taken by MBM in advance of trial. At these depositions, which Board

attorneys attended, no significant inquiry was made by the Board into the areas of alleged nonperformance sought to be introduced at trial, nor were further depositions taken by the Board at another time. It is clear from the record that MBM was therefore justifiably surprised by the offered evidence and would have been prejudiced by its admission.

The Board's allegation that MBM impliedly consented to the trial of these issues by not objecting until the evidence was finally offered is equally unpersuasive. The Board apparently fails to realize that the evidence was rejected because MBM had inadequate notice of the claims the offered evidence assertedly tended to prove. We cannot conceive how MBM could implicitly consent to something of which it had no knowledge. The Board's cited case, *Holley Coal Co. v. Globe Indemnity Co.*, 186 F.2d 291 (4th Cir. 1950), is distinguishable for the plaintiff there clearly had advance notice the defendant would present the challenged defenses and had knowledge of the specifics of those defenses. In light of these considerations, we do not disagree with the district judge's decision on these matters.

## II. THE EXPIRATION OF THE CONTRACT.

■ The Board claims the district court improperly found for MBM under the contract because, it argues, the express terms of the contract state that it normally expired on August 31 of each year unless renewed by the Board and the Board failed to renew on August 31, 1975. Therefore, the Board concludes, there was no contract on which to find liability after that date. We do not believe this contention merits much discussion for it is clear from the record, as the Board itself candidly admits in its brief, "there [was] a series of five . . . extensions agreed to by the par-

---

**3.** The Board additionally claims the evidence should have been admitted to allow refutation of MBM's allegations of compliance. This contention begs the question before the court for we are not holding that the Board is not allowed to refute MBM's claims. Rather, Rule 9(c) simply states that the Board must specifically allege in its pleadings *how* it is going to go about proving nonperformance.

ties.[4] For the Board to request and be granted these extensions of the renewal-opting period, allow MBM to continue its performance for almost ten months after the Board claims the contract had expired, and continue to pay MBM its bills during that period,[5] minus the 20% agreed to by the parties, renders unpersuasive its present contention that there was no contract between the parties.

The Board's argument that what was agreed to was an extension of the time in which the Board could exercise its option as opposed to an extension of the agreement itself is equally unpersuasive. The Board's logic would seem to be that during the extensions, MBM was bound to perform until the project was completed but the Board was under no obligation to pay for those services. Such a position is untenable when the record is clear that both parties treated the contract as a whole as continuing throughout the extension periods. We hold, therefore, that the district court correctly determined that the contract remained in force by agreement of the parties until June 31, 1976, and thus, correctly based its decision on the contract. Because of the result we reach we need not address the correctness of the district court's finding that even if the contract is deemed to have expired on August 31, 1975, the same amount was due under a theory of *quantum meruit*. MBM in its cross-appeal asserted that if this court should hold that the district court erred in granting MBM judgment on the contract, judgment on a *quantum meruit* theory, being also appropriate, would have resulted in a larger judgment than that entered on the contract. Because we have not reached the issue of *quantum meruit*, it is not necessary to decide the issue presented on the cross-appeal which was apparently urged only as an alternative protective measure.

## III. THE ADEQUACY OF THE EVIDENCE.

The Board next challenges three major conclusions of the district court as unsupported by the evidence introduced at trial. We will address each contention in turn.

At trial, the issue which consumed the greatest amount of time was the Board's contention that MBM's billing of 22% of its salary expense as fringe benefit costs overstated the actual amount of these costs, and thus violated the contract provision that the bills were to include "mandatory employment costs . . . and no other expenses." MBM presented substantial evidence that it was the established custom and usage in the construction industry throughout the United States, including Chicago, to bill fringe benefit costs as a set percentage of salary expense. This is done because of the impossibility of accurately computing the actual costs until well, often years, after the construction project is completed and the expenses have accrued. The district court agreed that this was a well established custom which must be read into the contract in light of the fact that the contract contained no contrary computation method, and that 22% was a fair and reasonable percentage to apply. We agree.

MBM's evidence concerning the custom and usage, some of which was from a study done for the Board by Arthur Anderson & Co., went, except for an unsupported and summary allegation, uncontested by the Board. MBM revealed, in fact that the 22% amount was approved by the Board's own

---

4. The Board's reliance on the contract provision that,, "Nothing in this agreement shall be interpreted to oblige the Board to pay anything in any fiscal year . . . in the event that the Board fails to . . . extend" is misplaced. The district court held and we agree that what obligated the Board to pay for the services rendered during the "extensions" is not any provision in the written contract, but rather are the post-execution oral and written arrangements between the parties made outside the provisions of the original contracts.

5. It is not questioned, as the Board's attorney himself pointed out at oral argument, that the bills paid during the extension periods were paid by official Board action, thus in compliance with Ch. 122, Ill.Rev.Stat. § 34–19 (1961).

representative, Mattox.[6] The Board's proof on the other hand, went to show that the actual costs to MBM of fringe benefits were closer to 19% of MBM's salary expense and, thus, the Board had been overbilled. MBM replied showing inconsistencies in the Board's computations and asserting that even utilizing the Board's formula the actual fringe benefit costs exceeded 22%. Given this conflicting evidence and realizing that the computation of actual expenses need not have been involved due to the lack of a Board response to MBM's custom and usage argument, we hold that the district court was not in error when it concluded that MBM did not violate the contract by billing in this manner, and that 22% was a fair and reasonable percentage to apply.

*The Omnidata Personnel*

The Board next contends MBM violated the contract by billing as its own employees computer personnel who were actually employees of a separate corporation, the Omnidata Corporation. At the time of the negotiation of the contract, MBM informed the Board that it was going to acquire Omnidata as a wholly-owned subsidiary. The contract provides, in fact, that MBM may bill for its own employees and those of wholly-owned subsidiaries, but no others. Due to technicalities and difficulties apparently surrounding Omnidata's outstanding debt, the merger between it and MBM did not take place. However, Omnidata personnel and its computer shared office space with MBM in New York and were treated by all parties, for practical purposes, as a division of MBM. Eventually, after the time period relevant here. Omnidata went out of business and MBM formally hired the Omnidata employees and purchased its computer.

The Board may well be correct in pointing out that the billing of Omnidata personnel as MBM employees technically violated the contract provisions. However, we disagree that this technical violation is of any consequence for the record demonstrates that the parties knew the use of the computer was a practical necessity for MBM to meet its contract obligations.[7] Had MBM not billed the Omnidata personnel as its own, it would have had to have made other arrangements for the performance of these necessary services, *i. e..* formally hiring Omnidata or equivalent personnel. We fail to see how the Board was damaged by the failure of MBM to go through the technical step of actually hiring the Omnidata employees when the record is clear that both parties thought that Omnidata would function as a subsidiary, that the merger was held up due to circumstances totally unrelated to the rehabilitation project, and where there is no allegation that MBM charged an unreasonable amount for the computer services. Furthermore, there was evidence submitted that the use of Omnidata personnel was known to the Board's representative, Maddox, and that he approved this procedure. In light of these considerations, we hold that the district court did not commit error in its decision on this matter.

*Senior Staffing Decisions*

The Board next complains that MBM overbilled by employing a greater number of senior staff personnel than provided for in the contract. MBM answered that the contract nowhere states that the listed positions were to be a limitation on the maximum number of employees MBM was allowed to employ, and that all staffing deci-

6. The Board's argument that this approval was not binding upon the Board because MBM is a "professional" organization is unpersuasive. The fundamental rules of agency law do not become inapplicable simply because the party dealing with the agent is a professional who, we will assume, has greater technical expertise than the agent. The Board made no showing that MBM withheld any material information from Mattox when obtaining his approval, and, as stated in the text *infra*, the accusation that MBM exercised "undue influence" over Mattox in obtaining his permission is not supported by the record.

7. The contract provided, *inter alia*, that, MBM was to "[d]evelop, design, implement, and maintain control systems, using manual and automated procedures . . . [and to]:
2. Furnish all computer hardware, if determined to be necessary for a particular operation, for meeting requirements.

sions and changes, including additions, were submitted to and approved by Mattox. MBM also points out that the Board paid all bills submitted to it which clearly delineated the employees' names whose work was included in the bill as well as the employees' positions, hours worked, and hourly rate. The Board replies that Mattox had no authority to approve *additions* to the senior staff, only replacements, and suggests that Mattox's approval of these decisions was obtained only after "undue influence" was exercised by MBM over Mattox at various business lunches.

■ We agree with the plaintiffs and the district court that the contract does not state that the listed positions were intended to serve as the maximum number of such positions allowable, or that MBM was precluded from using additional staff. The record also demonstrates that all additions to the staff were approved, and sometimes even requested by the Board through Mattox. Although the Board is correct in pointing out that the contract explicitly grants Mattox only the power to approve *replacements* in the senior staff, the Board apparently ignores the fact that Mattox was the third highest ranking individual in the Board's hierarchy and the one individual who was primarily responsible for the performance of the contract and of the rehabilitation program as a whole. Mattox clearly was clothed with the apparent authority to act for the Board in these ongoing personnel decisions in addition to his other duties explicitly mentioned in the contract. Nothing in the contract indicates otherwise.[8]

Furthermore, the record does not support the Board in its broad and summary accusations that MBM exercised "undue influence" over Mattox, even assuming such an occurrence could somehow allow the Board to escape liability for the acts of its agents and officials occurring in the performance of their apparent duties. In sum, the record is clear that all staffing decisions were

made with the approval and even at the request of the Board's agent, Mattox, and there has been no showing that such additions violated the express terms of the contract. Moreover, all bills setting forth the amounts charged for these additional individuals were paid by the Board after the approval of at least three Board officials. We, therefore, hold that the district court committed no error in finding that MBM properly received payment for these additional senior management personnel.

## IV. PREJUDGMENT INTEREST.

■ The Board lastly contends, correctly we believe, that the district court improperly awarded prejudgment interest to MBM. Illinois law provides that public bodies such as the Board of Education, in the absence of an express agreement or authorizing statute, shall not be liable for such interest unless the relevant funds have been wrongfully obtained and illegally withheld. *Morgan v. City of Rockford*, 375 Ill. 326, 328, 31 N.E.2d 596 (1940). Although the district court in *Pennwalt Corporation v. The Metropolitan Sanitary District of Greater Chicago*, 379 F.Supp. 899 (N.D.Ill.1974) stated the exception differently, that the funds must be wrongfully obtained *or* illegally withheld, other decisions of the Illinois Supreme Court citing this particular exception to the common law have used the conjunctive "and," and we believe this to be the proper test. *E. g., Morgan, supra*, and *Smith v. County of Logan*, 284 Ill. 163, 173, 119 N.E. 932, 936 (1918). There is no showing in the record that the Board wrongfully obtained or illegally withheld the monies owed. *See Pennwalt, supra*. The withholding of the 20% of the amounts billed was by agreement with MBM and, of course, nothing indicates the Board "wrongfully obtained" funds from the public. What we view here is a legitimate dispute over funds allegedly owed under a contract that unfortunately resulted in a judicial action when private settlement

---

8. The Board's reliance on Ch. 122, Ill.Rev.Stat. § 34–19 (1969) to invalidate these approvals is misplaced. By approving these additions, Mattox did not "expend" Board funds. Rather, the money was expended, as is relevant to that section, by the Board when it met in formal session and approved the payment of MBM's salary bills which contained all of the material information.

efforts failed. We see no reason to penalize the Board for protecting the public resources and we find no justification in the record for the award of prejudgment interest. This portion of the district court's award, therefore, is reversed.

### CONCLUSION

For the reasons stated above, and because we find appellant's remaining contentions equally unpersuasive,[9] the judgment of the district court is affirmed except insofar as it awarded MBM prejudgment interest; and to that extent it is reversed. Costs will be awarded to the appellee to the extent of 85% thereof.

AFFIRMED IN PART AND REVERSED IN PART.

---

9. In Count 2 of the Board's counterclaim, and actually throughout its brief, the Board repeatedly stresses that upon MBM's ceasing performance, only 70% of the project had been completed while 90% of the money owed MBM by the Board had been paid. The Board claims that MBM could not have completed the project for the amount remaining available for its compensation and concludes that it is owed the 20% difference in the above amounts.

Initially, it is to be noted that the allegation that MBM could not have completed the project is lacking any meritorious support in the record, was refuted by MBM, and, above all else, seems irrelevant to the Board's counterclaim. Whether or not MBM could or would have completed is, at best, speculative and is immaterial when MBM was stopped from completing the project by the Board's failure to renew the contract at the conclusion of the final extension period. Furthermore, the point that 70% of the project was completed while 90% of the money had been paid is of little consequence absent any indication in the record that this was abnormal or was in some way damaging to the Board. The amount billed, irrespective of its percentage, was for services performed in carrying out the contractual duties pursuant to the contract.