KATHLEEN BARRY *et al.*, Plaintiffs-Appellees, v. THE RETIREMENT BOARD OF THE FIREMEN'S ANNUITY AND BENEFIT FUND OF CHICAGO, Defendant-Appellant.

First District (6th Division)   Nos. 1—02—2962, 1—02—2963, 1—02—3548, 1—02—3549 cons.

Opinion filed April 29, 2005.

Burke, Burns & Pinelli, Ltd., of Chicago (Mary Patricia Burns, Vincent D. Pinelli, and Bonnie T. Kennedy, of counsel), for appellant.

Martin O. Holland, of Evergreen Park, for appellees.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiffs Iris Nutter, Jamie O'Callaghan, Patricia Jelinek, and Kathleen Barry each filed separate complaints for administrative review in the circuit court against defendant, the Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago (Board). The circuit court consolidated these four cases. Plaintiffs challenge the Board's decisions granting them widow's non-duty-related annuity benefits pursuant to section 6—141.1 of the Illinois Pension Code (Code or Pension Code) (40 ILCS 5/6—141.1 (West 2000)) rather than the greater widow's duty-related annuity benefits pursuant to section 6—140 of the Code (40 ILCS 5/6—140 (West 2000)).

A section 6—141.1 widow's non-duty-related annuity ("non-duty death benefit" or "non-duty annuity") entitles a widow of a firefighter who was not retired and had at least 1½ years of creditable service at the time of his death to the greater of (1) "30% of the salary attached to the rank of first class firefighter in the classified career service at the time of the fireman's death" or (2) 50% of the retirement annuity

for which her husband would have been eligible had he retired the day before his death. 40 ILCS 5/6—141.1 (West 2000). A section 6—140 widow's duty-related annuity ("duty death benefit" or "duty annuity") entitles a widow to a benefit equal to 75% of her husband's salary until the date on which her husband, had he lived, would have reached the age of compulsory retirement. 40 ILCS 5/6—140 (West 2000).

The circuit court reversed the Board and directed the Board to grant plaintiffs duty death benefits retroactive to the date of their applications. In addition, the court directed the Board to pay prejudgment and postjudgment interest. On appeal, the Board argues the following: (1) the circuit court lacked jurisdiction to consider the complaints for administrative review filed by Nutter, Jelinek, and Barry; (2) even if it had jurisdiction, reversal of the Board's denial of all of plaintiffs' requests for duty death benefits was improper because the Board's decisions were not clearly erroneous; and (3) the court's imposition of prejudgment and postjudgment interest on the Board was erroneous.

## BACKGROUND

### Iris Nutter

Iris Nutter is the widow of Harry Nutter (Mr. Nutter). Mr. Nutter began working as a paramedic for the Chicago fire department in July 1983 and in March 1994 suffered a myocardial infarction while at work. Based on that incident, the Board granted Mr. Nutter duty disability benefits beginning in March 1994. Mr. Nutter died on October 6, 1999; the death certificate states that the cause of Mr. Nutter's death was pulmonary edema due to pancreatic cancer and pneumonia. Following her husband's death, Nutter received a letter from the Board including "[a]n application for widow's and children's annuity." The application enclosed with the letter was entitled "Surviving Spouse's Affidavit—Application Under Oath." The application did not ask Nutter to identify the type of benefit for which she was applying, did not identify possible benefits to which she might be entitled, and did not refer to a specific statutory provision discussing such benefits. The Board's letter directed Nutter to mail the application for widow's annuity to its office with her husband's certified death certificate and stated that the application "[would] be presented to a regular monthly meeting of this Board."

Nutter filled out the application, attached her husband's death certificate, had the application notarized, and returned the application to the Board. The Board notified Nutter that it had granted her application in a November 29, 1999, letter, which stated in relevant part:

"At the regular meeting of this Board held on November 17, 1999, your application for widow's annuity was granted in the amount of $1,387.05 a month beginning October 7, 1999 ***.

* * *

If you dispute the above decision, under the provisions of Illinois Compiled Statutes, 40 ILCS 5/6—222, you must file for an Administrative Review of the Board's decision within thirty-five (35) days of the date of this letter. If you should have any questions, please do not hesitate to contact this office."

On June 9, 2000, a little over six months after the Board notified Nutter of its decision, Nutter filed a complaint for administrative review in the circuit court alleging the Board erroneously granted her a non-duty death benefit pursuant to section 6—141.1 of the Code (40 ILCS 5/6—141.1 (West 2000)) rather than a duty death benefit pursuant to section 6—140 of the Code (40 ILCS 5/6—140 (West 2000)). The Board filed a motion to dismiss Nutter's complaint, contending it was not filed within the 35-day time limit specified in section 3—103 of the Administrative Review Law (735 ILCS 5/3—103 (West 2000)).

Judge Thomas Durkin granted the Board's motion to dismiss and entered an order dismissing Nutter's complaint. Nutter filed a motion to reconsider, contending that her complaint should not have been dismissed because the Board's letter failed to inform her that she was denied a section 6—140 benefit and thus violated her due process right to receive notice of an adverse decision. Judge Durkin granted Nutter's motion to reconsider and vacated his previous order dismissing her complaint. The court's written order remanded the matter to the Board "for hearing upon the application with proper notice." In support of its ruling, the court explained:

"There is nothing in the method of the notice or the purported findings of the administrative agency that would cause the hairs on one's neck to raise and say, uh-oh, someone has done something to me, I'd better run to my lawyer.

In fact, it's quite the contrary. The notices seem quite benign and quite beneficent that it appears that you're the recipient of some largess and that a favor is being done to you by the agency rather than that you're going to suffer some extreme financial detriment by virtue of failing to act or by virtue of failing to be present at the hearing to present your side of the case.

Looking at it from a cost benefit analysis, it just wouldn't—it's a question of taking their form, spending two minutes to type in some additional language, and this would cost nothing insofar as time, effort and the benefit to potential claimants so far outweighs the minuscule consequences that would be imposed upon the Retirement Board that in my opinion is not a close case.

\* \* \*

My finding is that, in fact, Ms. Nutter is entitled to a hearing wherein she has been given sufficient notice to comply with the due process requirements of the Illinois Constitution."

On October 17, 2001, the Board conducted a hearing on Nutter's request for duty death benefits. As previously noted, in March 1994 Mr. Nutter suffered a myocardial infarction while at work. Although the parties did not call witnesses to testify, they did introduce numerous exhibits, including Mr. Nutter's death certificate, April 1996 and October 1997 findings made by Board physician Dr. George Motto, the minutes from a November 19, 1997, Board meeting, and a November 21, 1997, letter sent to Mr. Nutter by the Board. Dr. Motto's October 1997 findings and the minutes from the Board's November 1997 meeting indicate Mr. Nutter's disability was permanent. The Board's November 21, 1997, letter to Mr. Nutter states in relevant part:

"On Wednesday, October 15, 1997 the Board's physician reviewed your file and/or saw you in reexamination.

This is to inform you that at the regular meeting of this Board held on \*\*\* November 19, 1997, the Board approved the physician's report finding you unfit for duty at this time, and you are to be continued on the rolls in your present status of disability. It has been determined by the Board that you are Permanently disabled, therefore you are not rescheduled for an examination at this time."

Following the October 17, 2001, hearing, the Board entered a written decision denying Nutter's request for duty death benefits and notified Nutter of that decision in a November 29, 2001, letter.

The written decision contained several "Findings of Fact," including the following:

"4. As a result of his heart condition, Harry J. Nutter was granted a duty disability benefit on April 26, 1994 by the Retirement Board.

5. Harry J. Nutter was subject to recall to active duty at any time upon a physician's certification of fitness.

6. George S. Motto, M.D., the physician consultant to the Board periodically re-examined Harry J. Nutter in 1996 and 1997 following the granting of duty disability benefits by the Board and found that he should not return to duty with the Chicago Fire Department because of his heart condition.

\*\*\*

8. There was no indication on the medical examiner's report that Harry J. Nutter's heart condition contributed in any way to his death.

\*\*\*

10. The pulmonary edema and pancreatic cancer directly caused the death of Harry J. Nutter and prevented him from ever returning to active duty."

The written decision also contained several conclusions, including the following:

> "3. Harry J. Nutter was not a fireman killed in the performance of duty as prescribed in 40 ILCS § 5/6—140 because he died from pulmonary edema and pancreatic cancer which were not related to his performance of an act or acts of duty.
>
> 4. Moreover, the pulmonary edema and pancreatic cancer prevented Harry J. Nutter from ever resuming active service in the Chicago Fire Department.
>
> 5. Harry J. Nutter was prevented from resuming active duty in the Chicago Fire Department subsequent to his receipt of duty disability benefits as a result of something other than an act or acts of duty, i.e.[,] pulmonary edema and pancreatic cancer."

### Patricia Jelinek

Patricia Jelinek is the widow of Ronald C. Jelinek (Mr. Jelinek). Mr. Jelinek began working for the Chicago fire department in February 1956, and in August 1990, he suffered a heart attack while on duty. Based on that incident, the Board granted Mr. Jelinek duty disability benefits.

Mr. Jelinek died on December 24, 1999; the death certificate indicates the cause of death was myocardial infarction with congestive heart failure and diabetes as other significant conditions contributing to his death. Following her husband's death, Jelinek received a letter from the Board very similar to the one received by Nutter. The application form enclosed with the letter was identical to the application sent by the Board to Nutter. Jelinek filled out the application, attached her husband's death certificate, and returned the application to the Board. The Board notified Jelinek of its decision in a January 28, 2000, letter. The letter states in relevant part:

> "At the regular meeting of this Board held on January 19, 2000, your application for widow's annuity was granted in the amount of $2,001.38 a month beginning December 25, 1999 ***."

The letter, like the one sent to Nutter by the Board, stated that if Jelinek disputed the decision, she was required to file for an administrative review of the decision within 35 days.

On April 2, 2001, approximately 14 months after the Board's decision, Jelinek filed a complaint for administrative review in the circuit court alleging the Board erroneously granted her a non-duty death benefit pursuant to section 6—141.1 of the Code (40 ILCS 5/6—141.1 (West 2000)) rather than a section 6—140 duty death benefit (40 ILCS 5/6—140 (West 2000)).

### Kathleen Barry

Kathleen Barry is the widow of Edward Barry (Mr. Barry). Mr.

Barry began working for the Chicago fire department in February 1967, and in December 1989, he injured his neck and back after slipping on a turntable of Tower Ladder 39. Based on that incident, the Board granted Mr. Barry duty disability benefits. The record on appeal includes a January 9, 1991, report prepared by Board physician Dr. George S. Motto stating: "At the present time, Mr. Barry is disabled and cannot and should not fight fires because of documented cervical disc disease which required cervical discectomy with fussion [sic]. This disability is permanent."

Mr. Barry died on October 18, 1998; the death certificate indicates that the cause of death was "multiple injuries" due to a "fall on stairs." Following her husband's death, Barry received a letter from the Board similar to the letters received by Nutter and Jelinek. The application form enclosed with the letter, which Barry completed and sent to the Board, was identical to the applications sent to Nutter and Jelinek. The Board notified Barry in a November 29, 1999, letter that it had granted her application. The letter states in relevant part:

"At the regular meeting of this Board held on November 18, 1998, your application for widow's annuity was granted in the amount of $1,966.89 a month beginning October 19, 1998 *** ."

The letter, like the letters sent to Nutter and Jelinek, stated that if Barry disputed the decision, she was required to file for an administrative review of the decision within 35 days.

On April 2, 2001, over two years after the Board's decision, Barry filed a complaint for administrative review in the circuit court alleging the Board erroneously granted her a non-duty death benefit pursuant to section 6—141.1 of the Code rather than a section 6—140 duty death benefit.

### Jamie O'Callaghan

Jamie O'Callaghan is the widow of Emmett O'Callaghan. Mr. O'Callaghan entered the Fire Academy on December 1, 1994. On December 26, 1995, Mr. O'Callaghan injured his knee during a training exercise at the Academy. He never returned to the Academy and was granted duty disability benefits based on his injury.

Mr. O'Callaghan died on July 17, 2000; the death certificate indicates the cause of death was cardiac arrhythmia due to hypertension. O'Callaghan filled out an application for widow's annuity, attached her husband's death certificate to the application, and returned the application to the Board. The Board notified O'Callaghan of its decision granting a widow's annuity in the amount of $1,251.30 per month in an August 29, 2000, letter. Within less than 35 days, on September 18, 2000, O'Callaghan filed a complaint for administrative

review in the circuit court alleging the Board improperly failed to grant her a duty death benefit under section 6—140.

### Circuit Court's Rulings in the Consolidated Case

Judge Patrick McGann conducted a hearing on plaintiffs' consolidated complaints for administrative review. At the conclusion of that hearing, Judge McGann (1) reversed the Board's decision as to O'Callaghan, remanded the case, and directed the Board to grant her a duty death benefit pursuant to section 6—140 of the Code retroactive to the date of her husband's death; (2) took the case of Nutter under advisement; and (3) ordered a briefing schedule in the cases of Jelinek and Barry on the issue of whether the court had jurisdiction since the complaints were not filed within 35 days. The trial court made the following findings in support of its decision:

> "The [plaintiffs] are widows of four firefighters who for various reasons after suffering injuries or developing medical conditions apparently related to their work as firefighters were awarded duty disability benefits.
>
> Each of their husbands remained in that status until their deaths. None of the firemen had reached retirement. And there was no evidence presented that their death was related to the injury that caused their job related disability.
>
> [Section 6—140 of the Code] grants an annuity to the widow of any firefighter whose death results from the performance of an act or acts of duty.
>
> However, no annuity is paid unless the death results from the act or acts of duty or the firefighter is prevented from subsequently returning to duty. This inability to resume normal firefighter service must be as a result of the act or acts of duty which caused the disability.
>
> The Board posits that a causal connection between the injury and death must be established. They urge the Court to anticipate the terrible consequences of eliminating this requirement.
>
> They argue that no legislature intended a drunk driver widow should receive a pension intended for the widow of men who gave their all, even their health and lives, for fire service and citizens of Chicago.
>
> While that argument has great appeal, this Court is bound by precedent."

The trial court then discussed *Tonkovic v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 282 Ill. App. 3d 876 (1996), and *Swoope v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 323 Ill. App. 3d 526 (2001). The trial court observed that in *Tonkovic* the appellate court stated:

"The plain language of the second clause [of section 6—140's third paragraph] provides that a surviving spouse is eligible for duty death benefits if the decedent firefighter's performance of an act or acts of duty prevented him from resuming active service until his or her death. Under this clause, it is irrelevant to the question of eligibility for widows' duty death benefits whether the decedent's [duty-related injury] resulted directly in his death ***. *Tonkovic*, 282 Ill. App. 3d at 880."

The trial court further observed that the appellate court's decision in *Swoope*, which construed a statute applicable to widows of police officers similar to section 6—140 of the Code, was consistent with the decision in *Tonkovic*. The trial court noted that in *Swoope* the reviewing court held that "the surviving widow had the burden of proving not that the duty-related injury caused the death but that it caused a continuing inability to return to work."

After discussing *Swoope* and *Tonkovic*, the trial court stated "[o]ne of the problems I had with this case is I did not have the administrative record. No one gave me a copy of the administrative record." After counsel asked the trial court to specify for which case he wanted a record, the court responded "the decision of the Board in the Nutter and O'Callaghan case[s]." Counsel then advised the trial court that while the Board "never made a decision in O'Callaghan," there was a finding of fact in the Nutter case. The trial court then noted that this finding stated "pulmonary edema and pancreatic cancer directly caused [Mr. Nutter's] death and prevented him from ever returning to active duty."

Following this discussion, the trial court specifically ruled with respect to each plaintiff. As to O'Callaghan, the court stated "in accord with established precedent, the decision of the Board *** is reversed and remanded. The Board is directed to grant her a widow's duty disability pension retroactive to the date of her late husband's death."

The court took the Nutter case under advisement, explaining that while the case involved an issue of law, it also involved an issue of fact based on *Swoope*. Specifically, the court stated that it had not adequately considered the Board's express finding that it was Mr. Nutter's cancer, not his duty disability, which prevented him from returning to active service. Approximately two weeks later, on July 19, 2002, the trial court ruled on the Nutter case, reversing the Board's decision denying Nutter a duty death benefit and remanding the case to the Board with directions to grant her a duty death benefit, stating in relevant part:

"The one issue left unresolved on July 3, 2002 was a review of

the factual determination made by the [Board] that the pulmonary edema and pancreatic cancer directly caused the death of Harry J. Nutter and prevented him from ever returning to active duty. While this is literally true, for purposes of these proceedings, the finding is against the manifest weight of the evidence.

In the minutes of the regular meeting of the [Board] held on November 19, 1997, the Board accepted its physician recommendation that Harry Nutter, the spouse of the applicant, be granted a Permanent Duty Disability. Thus, a factual finding by the Board existed that Mr. Nutter's medical condition was of such a state that he would never be able to return to active duty as a Chicago Fire Fighter due to his duty related heart condition. In the absence of any medical evidence that the late Mr. Nutter's heart condition ameliorated to the extent that would have allowed him to return to work, a finding by the Board of an apparent intervening and independent cause of his disability is contrary to the directive found in *Tonkovic* ***."

On August 22, 2002, the trial court ruled on the Jelinek and Barry cases. The order reversed the Board's decision denying Jelinek and Barry a duty death benefit and remanded the cases with directions to the Board to grant duty death benefits to Jelinek and Barry retroactive to the date of the death of their spouses. The order first addressed the question of the trial court's jurisdiction and stated in relevant part:

"This court has made a *sua sponte* inquiry into its jurisdiction to hear plaintiffs Patricia Jelinek's and Kathleen Barry's *** administrative reviews due to their failure to meet the 35-day time limit imposed by the Administrative Review Law, 735 ILCS 5/3—101, *et seq.* This court's predecessor *** decided the 35-day time limit was inapplicable to [Nutter] because the notice given was inconsistent with due process. In reaching this decision, Judge Durkin noted that the notices were benign and quite beneficent, and did not alert Nutter that she was about to suffer financial detriment.

                              * * *

*** In this case, plaintiffs were not present at the meeting where the widow's benefits were discussed, and therefore, were not alerted to the difference between ordinary widow benefits and death duty benefits. Thus, this court has jurisdiction to hear the administrative reviews of plaintiffs Jelinek and Barry."

As to whether Jelinek and Barry were entitled to duty death benefits, the court stated:

"As noted in my decision on July 3, 2002, the relevant question in determining eligibility is not whether the duty related disability

caused the death, but rather whether the duty related disability prevented the fire fighter from returning to active service. [Citation.] In the absence of any such evidence, the deceased firefighters['] inability to return to active duty can be attributed only to the medical condition that created the disability.

IT IS ORDERED that the decision of the [Board] is reversed and the matter is remanded with directions to the Board to grant a Duty Disability Widow's pension to Patricia Jelinek and Kathleen Barry retroactive to the date of the death of their spouses."

Plaintiffs filed a motion for prejudgment interest, and the court granted the motion, stating:

"So I will grant prejudgment interest to them from the date of the deaths of their husbands because that's the date in which the accrual to the right occurs and that will be at five percent to the date of the judgment I entered and it stops at the date of the judgment I entered and then will obviously run at nine percent from that date forward."

We consolidated the Board's separate appeals of the trial court's orders reversing the Board's denials of plaintiffs' requests for duty death benefits and of the order directing it to pay prejudgment and postjudgment interest.

## ANALYSIS

### Section 3—103 of the Administrative Review Law

The Board does not challenge the court's jurisdiction over the O'Callaghan complaint because O'Callaghan filed it within 35 days in accordance with section 3—103 of the Illinois Administrative Review Law (Review Law) (735 ILCS 5/3—103 (West 2000)). However, the Board contends that the circuit court lacked jurisdiction over the Nutter, Jelinek and Barry complaints because they were not filed within 35 days in accordance with section 3—103 of the Review Law (735 ILCS 5/3—103 (West 2000)). Section 3—103 of the Review Law (formerly known as the Administrative Review Act) states:

"Every action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected by the decision ***." 735 ILCS 5/3—103 (West 2000).

The requirement that administrative review complaints be filed within the 35-day period specified in section 3—103 of the Review Law is jurisdictional. *Brazas v. Property Tax Appeal Board*, 309 Ill. App. 3d 520, 526 (1999). Whether the trial court had jurisdiction is a question of law and thus our review is *de novo*. *Northwest Diversified, Inc. v. Desai*, 353 Ill. App. 3d 378, 395 (2004).

Nutter, Jelinek, and Barry contend that the 35-day rule does not bar jurisdiction over their complaints in the instant case because the notices sent to them by the Board did not inform them that an adverse decision had been made with respect to their applications. "A final and binding decision by an administrative agency requires, at the very least, that the agency has taken some definitive action with regard to the application before it and that the applicant has been informed of the action." *Illinois Wood Energy Partners, L.P. v. County of Cook*, 281 Ill. App. 3d 841, 851 (1995). The 35-day statute of limitations under the Review Law does not bar a plaintiff's claims where an administrative agency fails to fairly and adequately inform a plaintiff of its decision. *Keller v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 245 Ill. App. 3d 48, 53-54 (1993).

In *Keller*, the plaintiffs filed a complaint alleging the Board reduced the amount of annuity benefits paid to widows of Chicago firefighters in violation of the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 631 *et seq.* (1988)). *Keller*, 245 Ill. App. 3d at 49. The Board moved to dismiss their complaint on the ground that it was barred by the 35-day statute of limitations included in the Review Law. *Keller*, 245 Ill. App. 3d at 50. The trial court denied the motion, and the Board appealed, contending the limitations period barred the complaint. *Keller*, 245 Ill. App. 3d at 50, 52-53.

*Keller* held that the statute of limitations did not bar the plaintiffs' complaint. *Keller*, 245 Ill. App. 3d at 54. In support of its holding, the court relied upon two separate bases. First, the court concluded that the plaintiffs were never actually notified of the Board's decision to terminate their 75% annuity benefits. *Keller*, 245 Ill. App. 3d at 53-54. The court specifically noted that notice letters sent to the plaintiffs did not mention the Board's decision to terminate their 75% widow's annuity, but instead stated that at a regular meeting of the Board, their application for annuity benefits was granted. *Keller*, 245 Ill. App. 3d at 53. *Keller* found the letters mailed to plaintiffs by the Board did not give the plaintiffs fair and adequate notice. *Keller*, 245 Ill. App. 3d at 53. The court reasoned that the Board's failure to notify the plaintiffs of its decision to terminate their 75% annuity benefit called into question the applicability of the Review Law because the Review Law contemplates " 'some sort of adversarial proceeding, involving the parties affected, out of which will come a decision by an agency and a record upon which the decision was based.' " *Keller*, 245 Ill. App. 3d at 53-54, quoting *Sturm v. Block*, 72 Ill. App. 3d 306, 311 (1979).

The second basis relied upon by the court in *Keller* to support its holding that the statute of limitations did not bar the plaintiffs'

complaint was the Board's failure to give plaintiffs notice of their right to appeal the Board's decision within 35 days. *Keller*, 245 Ill. App. 3d at 54. Such notice, the court observed, was required by *Johnson v. State Employees Retirement System*, 155 Ill. App. 3d 616 (1987), *overruled by Carver v. Nall*, 186 Ill. 2d 554, 563 (1999). *Keller*, 245 Ill. App. 3d at 53.

The record in the instant case reflects that the Board did take action with respect to the applications of Barry, Jelinek, and Nutter and notified them of their right to appeal within 35 days. However, as in *Keller*, the record does not reflect that the Board informed the widows of what action was taken. The letters initially sent by the Board to Barry, Jelinek, and Nutter following their husbands' deaths provided the context in which the widows received the Board's subsequent notification letters. Each of the initial letters stated the Board was enclosing "an application for widow's and children's annuity" and "[a]n affidavit for the ordinary benefit due you as the beneficiary of your late husband, to be signed and notarized." Each letter also stated that the widows' applications would be presented at a "regular" meeting of the Board. The letters did not mention the section 6—140 duty death benefit or indicate that Barry, Jelinek, and Nutter could apply for that type of benefit. The enclosed applications were entitled "Surviving Spouses's Affidavit—Application Under Oath" and did not list or designate different types of benefits for which Barry, Jelinek, and Nutter could apply or could be eligible. Nor did the applications identify or refer to statutory sections defining the different types of benefits.

Like the letters and applications initially sent to Nutter, Barry, and Jelinek, the subsequent letters notifying them of the decisions taken with respect to their applications were similarly misleading. Those letters, like the ones in *Keller*, stated that "your application for widow's annuity was *granted* in the amount of." (Emphasis added.) The letters did not specify what kind of annuity had been granted. Rather, they simply informed Nutter, Barry, and Jelinek of the respective amounts that they would receive each month. In *Keller*, none of the letters stated the Board had terminated the plaintiffs' 75% widow's annuity. Similarly, in the instant case, none of the letters told Nutter, Barry and Jelinek that a duty-related 75% widow's annuity would not be given.

The Board contends that the supreme court's decision in *Carver*, 186 Ill. 2d 554, "is applicable to the instant matter and necessitates that the circuit court's decision be reversed." Contrary to the Board's contention, *Carver* is not applicable in the instant case as it addressed and resolved an issue that is not now before us. In *Carver*, the supreme

court held that an administrative agency's failure to inform a party of its right to administrative review and the 35-day time limit for exercising that right does not toll the 35-day statute of limitations because the right to appeal from an administrative decision is not essential to due process of law. *Carver*, 186 Ill. 2d at 562-63.

The issue in the instant case does not arise from any failure by the Board to notify Jelinek, Barry, and Nutter of their right to appeal or of the 35-day time limit for filing such an appeal. In fact, here the Board did notify plaintiffs of their right to appeal and notified plaintiffs of the 35-day time limit. Rather, the issue is whether the Board's letters "granting" the applications of Barry, Jelinek, and Nutter barred application of the 35-day statute of limitations because the Board's letters were misleading and failed to notify plaintiffs of the Board's decision to deny duty death benefits.

We recognize that *Carver* overruled the holding in *Johnson* that failure to give notice of the right to appeal and notice of the 35-day time limit for filing such an appeal bars application of that 35-day time limit. We also recognize that this holding in *Johnson*, as discussed above, constituted the second of two separate bases relied upon by the *Keller* court to toll the 35-day statute of limitations. We note, however, that the supreme court in *Carver* did not overrule the first basis relied upon by *Keller* in support of its decision not to apply the 35-day time limit, namely, that "fair and adequate" notice of the decision taken by the Board is necessary to activate the 35-day statute of limitations. Thus, *Keller* provides support for the proposition that "fair and adequate" notice of the decision is necessary to activate the 35-day rule. As previously noted, the letters in *Keller* did not satisfy "fair and adequate notice" because the plaintiffs "were never actually notified of the Retirement Board's decision to terminate their 75% annuity benefits." *Keller*, 245 Ill. App. 3d at 53-54. The letters in the instant cases were similarly lacking.

The Board contends that the reference in the subject notices to the dollar amount each widow would receive each month "made it easy for the widows to calculate and know that they were being granted an ordinary widows' benefit of 50% rather than the higher 75% duty death benefit" and thus adequately notified Barry, Jelinek, and Nutter of its "decision." To support this contention, the Board relies on *Johnson v. Machetti*, 228 Ill. App. 3d 420 (1992). *Machetti* is factually distinct from the instant case.

In *Machetti*, a police board moved to dismiss an officer's administrative complaint alleging that the board improperly awarded him a disability pension equal to 50% of his salary rather than 65% of his salary. *Machetti*, 228 Ill. App. 3d at 422. The board based its motion on

the plaintiff's failure to file his complaint within the 35-day period. *Machetti*, 228 Ill. App. 3d at 422. The trial court granted the board's motion, and plaintiff appealed, contending the notification letter, which stated he would receive $1,549.10 per month, did not inform him the board had granted a 50% disability pension rather than a 65% disability pension. *Machetti*, 228 Ill. App. 3d at 422.

The reviewing court rejected the plaintiff's argument, noting that the plaintiff was present at the board meeting and hearing where his pension was discussed and admitted on appeal that upon receiving the letter from the board, he made a calculation and discovered that he had been awarded only a 50% pension. *Machetti*, 228 Ill. App. 3d at 422-23. In *Machetti*, the plaintiff was not only present at the board meeting and hearing where his disability pension was discussed, but he also presented the board with letters from doctors and other information. *Machetti*, 228 Ill. App. 3d at 423. In contrast to the plaintiff in *Machetti*, plaintiffs in the instant case were not present at the meetings during which widows' benefits were discussed. No hearings were conducted where plaintiffs introduced evidence. Unlike *Machetti*, in the instant case the record does not reflect plaintiffs Jelinek, Barry and Nutter used the dollar amounts specified in the Board's letters to calculate what percentage of their husbands' salaries they had received.

■ Fair and adequate notice of the decision taken by the Board is necessary to activate the 35-day rule. See *Keller*, 245 Ill. App. 3d at 53-54. The Board's letters granting the applications of Barry, Jelinek and Nutter barred application of the 35-day statute of limitations because the letters were misleading and failed to notify them of the Board's adverse decision denying the 75% duty death benefits. For the reasons previously discussed, we conclude the circuit court had jurisdiction over the complaints for administrative review filed by Nutter, Jelinek, and Barry.

### Section 6—140 of the Pension Code

The Board next contends that even if the trial court had jurisdiction over plaintiffs' complaints, it erred by concluding plaintiffs were entitled to duty death benefits pursuant to section 6—140 of the Code.

■ We note that we are required to review the Board's decision rather than the circuit court's decision. *Calabrese v. Chicago Park District*, 294 Ill. App. 3d 1055, 1065 (1998). "When the decision of an administrative agency presents a mixed question of law and fact, the standard of review is clearly erroneous ***." *Gardziella v. City of Chicago*, 337 Ill. App. 3d 181, 183 (2003). The clearly erroneous standard of review falls between a manifest weight of the evidence

standard and a *de novo* standard and gives some deference to the agency's expertise and experience. *Swoope*, 323 Ill. App. 3d at 529. Whether the Board properly construed and applied section 6—140 of the Code in concluding that plaintiffs Nutter, Jelinek, Barry and O'Callaghan were not entitled to duty death benefits presents a mixed question of law and fact, which we review under the clearly erroneous standard.

Section 6—140 of the Code states in relevant part:

"The annuity for the widow of a fireman whose death results from the performance of an act or acts of duty shall be an amount equal to 50% of the current annual salary attached to the classified position to which the fireman was certified at the time of his death and 75% thereof after December 31, 1972, and it shall be payable to the widow until the fireman, had he lived, would have attained the age prescribed for compulsory retirement.

Thereafter the widow shall receive annuity of an amount equal to 40% of the current annual salary attached to the classified position to which the fireman was certified at the time of his death. \*\*\*

*Unless the performance of an act or acts of duty* results directly in the death of the fireman, or *prevents him from subsequently resuming active service in the fire department*, the annuity herein provided shall not be paid; nor shall such annuities be paid unless the widow was the wife of the fireman at the time of the act or acts of duty which resulted in his death." (Emphasis added.) 40 ILCS 5/6—140 (West 2000).

At the time the parties filed their briefs, the primary case construing section 6—140 of the Code was *Tonkovic*. In *Tonkovic*, the Board argued that a fireman's widow is not entitled to duty death benefits under section 6—140 unless she establishes her husband's death resulted from " 'an act or acts of duty.' " *Tonkovic*, 282 Ill. App. 3d at 879. *Tonkovic*, in rejecting the Board's interpretation of section 6—140, found the Board's causation argument ignored a clause in the final paragraph of the statute and explained as follows:

"[T]he plain language of the second clause provides that a surviving spouse is eligible for duty death benefits if the decedent fire fighter's performance of an act or acts of duty prevented him from resuming active service until his or her death. Under this clause it is irrelevant to the question of eligibility for widow's duty death benefits whether decedent's 1980 heart attack resulted directly in his death 14 years later. Rather, the focus is whether the fire fighter is injured due to an act or acts of duty and then dies without having returned to active service.

\*\*\*

Having placed decedent on duty disability in 1980, the Board

necessarily admits that decedent was injured due to an act or acts of duty. Decedent remained on duty disability, subject to recall to active duty upon a physician's certification of fitness, until his death in 1994. Accordingly, Tonkovic qualifies for widow's duty death benefits under the second clause of [the final paragraph of] section 6—140 of the Illinois Pension Code." *Tonkovic*, 282 Ill. App. 3d at 880.

The Board contends that *Tonkovic*, upon which the trial court relied, "should not be controlling precedent insofar as it is premised on a faulty interpretation of section 6—140 of the Code." The Board argues that "the plain statutory language [of the above provision] creating the benefit at issue is limited by its express terms to widows whose husbands' deaths result from the performance of an act of duty." The Board maintains that *Tonkovic* should not be applicable where the facts demonstrate the primary cause of the fireman's death was unrelated to the "act or acts of duty" that rendered him disabled and entitled him to receive duty disability benefits. Plaintiffs respond that *Tonkovic* correctly construed section 6—140 and that the Board's decision is in direct conflict with section 6—140 and the holding in *Tonkovic*. Since *Tonkovic*, but after the parties in this case filed their briefs, the meaning of section 6—140 of the Code was further clarified in *Bertucci v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 351 Ill. App. 3d 368 (2004), *appeal denied*, 212 Ill. 2d 528 (2004).

In *Bertucci*, fire fighter James Bertucci was granted duty-related disability benefits by the Board after he suffered a spinal-compression fracture while on duty in 1991. *Bertucci*, 351 Ill. App. 3d at 369. A Board physician subsequently examined James in December 1994, January 1997, and March 1998. *Bertucci*, 351 Ill. App. 3d at 369. In his March 1998 report, the Board's doctor found James " 'permanently disabled due to prior injury,' " and opined that James would " 'never return to work.' " *Bertucci*, 351 Ill. App. 3d at 369. In 2001, James died of lung cancer, and thereafter his widow (the plaintiff) applied for duty death benefits under section 6—140 of the Code. *Bertucci*, 351 Ill. App. 3d at 369.

In June 2001, the Board conducted a hearing on the plaintiff's application. *Bertucci*, 351 Ill. App. 3d at 369. The Board's doctor testified that James was permanently disabled in March 1998 due to lower-back pain arising from a spinal-compression fracture he sustained in his 1992 fall from the fire-truck ladder. *Bertucci*, 351 Ill. App. 3d at 369. The doctor also testified that cancer unrelated to an act of duty was the cause of death. *Bertucci*, 351 Ill. App. 3d at 369-70. The Board denied the widow's application for a duty death benefit under section 6—140 of the Code and instead awarded her a non-duty death benefit

under section 6—141.1 of the Code. *Bertucci*, 351 Ill. App. 3d at 370. The Board based this ruling on its finding that "James did not die in the performance of an act of duty." *Bertucci*, 351 Ill. App. 3d at 370. The circuit court reversed that denial, and the Board appealed. *Bertucci*, 351 Ill. App. 3d at 370.

On appeal, the court stated the issue before it was "whether a fire fighter who is permanently disabled in the course of his duties, and who dies without returning to work, should be treated like a fire fighter who dies in the line of duty or from injuries received directly in the line of duty." *Bertucci*, 351 Ill. App. 3d at 372. The court explained that resolution of this issue turned upon construction of the third paragraph of section 6—140 of the Code, which states in relevant part: "Unless the performance of an act or acts of duty results directly in the death of the fireman, or prevents him from subsequently resuming active service in the fire department, the annuity herein provided shall not be paid ***." 40 ILCS 5/6—140 (West 2000). Specifically, the court stated, it was necessary to construe the phrase, " 'performance of an act or acts of duty *** prevents him from *subsequently* resuming active service in the fire department.' " (Emphasis added.) *Bertucci*, 351 Ill. App. 3d at 373, quoting 40 ILCS 5/6—140 (West 2000). The court construed the phrase to mean that "the *duty-related injury permanently prevents* a fire fighter from *resuming* active duty with the fire department." (Emphasis in original.) *Bertucci*, 351 Ill. App. 3d at 373-74. The court explained, "[i]t is therefore the fire fighter's injury, and not his death, which establishes whether the fire fighter may subsequently resume his duties with the fire department." *Bertucci*, 351 Ill. App. 3d at 374.

In support of this construction of section 6—140 of the Code, the court extensively discussed the construction of a similar statute applied by the court in *Swoope* and noted that it found *Swoope* instructive and agreed with *Swoope*'s analysis. *Bertucci*, 351 Ill. App. 3d at 371-74. Following *Swoope*, the *Bertucci* court reasoned:

> " ' When interpreting the phrase at issue, we look to the plain and ordinary meaning of the terms.' [Citations.] The court in *Swoope* looked to the meaning of 'subsequently' to support the 'narrow expansion' of the benefits provided by [the section at issue in *Swoope*]. [Citations.] 'The plain and ordinary meaning of the term "subsequently" is "following in time: coming or being later than something else." ' [Citations.] 'Thus, the provision refers to an injury incurred in the performance of an act of duty which prevents the [fire fighter] from resuming service as a [fire fighter] subsequent to, or following, that injury. If, at anytime after the injury, the [fire fighter] can or could possibly resume his duties as a

[fire fighter], his widow is excluded from receiving compensation or supplemental annuities. Because the statute does not define an ending point to this time period, we interpret the phrase to mean that the injury was so severe, and of such a character, as to prevent the [fire fighter] from ever resuming service as a [fire fighter].' [Citation.]

Thus, the phrase at issue means that the duty-related injury *permanently prevents* a fire fighter from *resuming* active duty with the fire department. It is therefore the fire fighter's injury, and not his death, which establishes whether the fire fighter may subsequently resume his duties with the fire department. \*\*\*

Therefore, in conformity with the *Swoope* court, 'we hold that, under [section 6—140's third paragraph], a widow must establish with medical evidence and testimony that her husband's injury, but for his death, would have prevented him from subsequently, or ever, resuming service with the [fire] department.' " (Emphasis in original.) *Bertucci*, 351 Ill. App. 3d at 373-74, quoting *Swoope*, 323 Ill. App. 3d at 531.

Applying this construction of section 6—140 to the case before it, the *Bertucci* court found that James's widow qualified for a duty death benefit. *Bertucci*, 351 Ill. App. 3d at 374, 379. The court explained that although the work-related injury giving rise to his duty-related disability was unrelated to his death, the testimony and findings by the Board's doctor established that the duty-related injury permanently prevented James from returning to active duty. *Bertucci*, 351 Ill. App. 3d at 374.

■ We conclude that *Bertucci* establishes that a fireman's widow may qualify for duty death benefits under section 6—140 of the Code if she demonstrates that her husband suffered a duty-related injury which either (1) caused his death or (2) caused him to be permanently unable to return to active duty. We adopt this construction of section 6—140 of the Code. In applying this construction, we must determine whether the facts establish that the duty-related injuries of plaintiffs' husbands permanently prevented them from returning to active duty.

In its brief, the Board states that "the burden was on the individual wife to demonstrate by 'medical evidence' that her husband was permanently disabled and unable to ever return to work." The Board argues that "[p]laintiffs presented no evidence, medical or otherwise, that their husbands would never be able to return to duty. It is uncontested that each of the individual husbands remained on active status, ready for recall if the Board's physician ever became comfortable that their disability had ceased or that jobs had become available within the Department that they could safely perform, *i.e.,* light duty, notwithstanding their disability. The fact that the Board's

physician stopped examining them annually does not mean that they were 'permanently' disabled within the meaning of *Swoope* or that he would not have, or could not have, reached a conclusion at a future date that they were fit for duty, but for their intervening deaths."

The Board lumps together its discussion of all four plaintiffs. We note, however, that the Board only conducted an evidentiary hearing in the case of Nutter. We therefore separately discuss the evidence in the Nutter record as it relates to the question of whether duty-related injuries permanently prevented Mr. Nutter from returning to active duty.

At the Nutter hearing on remand to the Board, counsel for Nutter introduced evidence indicating that the Board's own physician, Dr. Motto, determined that Mr. Nutter was permanently disabled, and indeed the Board itself adopted this finding and notified Mr. Nutter of this determination in its November 1997 letter to him. Despite this evidence, the Board concluded in its written decision that Mr. Nutter "was prevented from resuming active duty in the Chicago Fire Department subsequent to his receipt of duty disability benefits as a result of something other than an act or acts of duty, *i.e.*[,] pulmonary edema and pancreatic cancer." This finding of the Board directly contradicted its own prior determination of permanent disability based upon the findings of its own physician. Indeed, as Judge McGann's July 19, 2002, written order noted, "a factual finding by the Board existed that Mr. Nutter's medical condition was of such a state that he would never be able to return to active duty *** due to his duty related heart condition." Judge McGann concluded that "[i]n the absence of any medical evidence that *** Mr. Nutter's heart condition ameliorated to the extent that would have allowed him to return to work, a finding by the Board of an apparent intervening and independent cause of his disability is contrary to the directive found in *Tonkovic*."

■ We agree with Judge McGann's conclusion. The evidence in the instant case established that Mr. Nutter's duty-related disability permanently prevented him from returning to active duty. In light of the permanent nature of Mr. Nutter's heart condition, the fact that some other subsequent condition may also have prevented him from returning to active duty, such as the cancer which ultimately caused his death, is irrelevant in the context of section 6—140's requirements. We conclude that the record demonstrates Mr. Nutter's duty-related heart condition permanently prevented him from resuming active duty and that the Board's conclusion otherwise was clearly erroneous. Accordingly, we affirm the trial court's reversal of the Board's denial of duty death benefits to Nutter.

The Board cites no medical evidence in the record showing that

the duty-related injuries or conditions of plaintiffs' husbands were not permanent. Despite its failure to conduct evidentiary hearings on whether duty-related injuries permanently prevented the firemen from returning to active duty, the Board argues that "[c]ertainly a neck injury such as [Mr.] Barry suffered and the knee injury in a young man like [Mr.] O'Callaghan were not the types of injuries that would forever preclude employment." We note that the record developed during the disability hearings contradicts this argument.

While the Board did not conduct hearings at which it directly addressed and ruled upon the factual issue of whether duty-related injuries permanently prevented Mr. Barry, Mr. Jelinek, and Mr. O'Callaghan from returning to active duty, the Board did conduct hearings on whether they were entitled to duty disability following their respective job-related injuries. In fact, evidence presented at Mr. Barry's disability hearing directly relates to the issue of the permanency of his injuries. For example, a January 9, 1991, report prepared by the Board's own physician, Dr. George Motto, states that "[Mr. Barry's] disability is permanent." That report was attached as an exhibit to the Board's supplemental answer to Barry's complaint for administrative review. Also attached to that supplemental answer is a transcript of testimony given by Dr. Motto at Mr. Barry's disability hearing in February 1991. At that hearing, Dr. Motto opined that "at the present time Mr. Barry is disabled and cannot and should not fight fires because of documented cervical disc disease which required cervical discectomy with fusion. It is a permanent disability." These documents reflect that Mr. Barry's disc disease permanently precluded him from resuming active duty.

As to Mr. Jelinek, the record reflects that he suffered a heart attack while on duty in August 1990, was granted duty disability based upon that incident, and remained on duty disability until his death in December 1999. The length of time Mr. Jelinek was on duty disability prior to his death and the fact the cause of his death was myocardial infarction reflect that his duty-related injury permanently precluded him from resuming active duty. Regarding Mr. O'Callaghan, we note that a July 23, 1997, report prepared by Dr. Moto on behalf of the Board in connection with Mr. O'Callaghan's application for disability concluded that Mr. O'Callaghan was disabled and stated that he sustained "permanent right knee injuries."

The Board argues O'Callaghan, Barry, and Jelinek failed to meet their burden of establishing that their husbands' injuries permanently prevented them from resuming active duty with the fire department. However, as previously noted, the Board never conducted hearings at which Barry, Jelinek, and O'Callaghan were given the opportunity to

present such evidence. Accordingly, we vacate the trial court's orders reversing the Board's denial of duty death benefits and imposing prejudgment and postjudgment interest in the cases of O'Callaghan, Barry, and Jelinek; we vacate the Board's denial of duty death benefits to O'Callaghan, Barry, and Jelinek; and we remand this case to the Board to allow O'Callaghan, Barry, and Jelinek an evidentiary hearing on the issue of whether their husbands' duty-related disabilities permanently prevented them from returning to active duty with the fire department. See *Swoope*, 323 Ill. App. 3d at 531 (remanding case to police Board to give officer's widow the opportunity to present medical evidence and testimony that her husband's injury, but for his death, would have prevented him from ever resuming service with the police department).

## Prejudgment Interest

The Board next argues that the trial court erred and failed to properly exercise its discretion when it awarded prejudgment interest to plaintiffs. Because we have vacated the portion of the trial court's order awarding interest to O'Callaghan, Barry, and Jelinek, we address this interest-related argument by the Board in Nutter's case only.

At the conclusion of the September 19, 2002, hearing on plaintiffs' motion for prejudgment interest, the trial court granted plaintiffs 5% interest on the amount of the duty death benefit due to them from the date of the deaths of their husbands to the dates of judgment. In support of its ruling, the trial court stated:

"[I]t appears to me that the appellate court has taken the tack that prejudgment interest does apply in these situations and my understanding is that the 1971 Illinois Constitution did away with government immunity and that's the purpose of the Tort Immunity Act and it seems to me that since the appellate court has taken that position, in these cases I am duty bound to follow that.

\* \* \*

I believe that there's a[n] honest dispute between the Board and the claimants and I think the appellate court has resolved it adverse to the \*\*\* position of the Board."

"The decision whether to award prejudgment interest is within the circuit court's sound discretion, subject to reversal only upon abuse of discretion." *United States Fidelity & Guaranty Co. v. Alliance Syndicate, Inc.*, 286 Ill. App. 3d 417, 420 (1997). Interest may generally be recovered from unsuccessful defendant debtors when permitted by a statute. *City of Springfield v. Allphin*, 82 Ill. 2d 571, 577 (1980). Section 2 of the Illinois Interest Act (Interest Act) states in relevant part:

"Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing ***." 815 ILCS 205/2 (West 2000).

The appellate court has previously applied section 2 of the Interest Act in cases brought against boards responsible for administering pension funds. See *Fenton v. Board of Trustees*, 203 Ill. App. 3d 714, 721, 723-24 (1990); *Barber v. Board of Trustees of the Village of Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 819 (1993); *Martino v. Police Pension Board*, 331 Ill. App. 3d 975, 983 (2002). In *Fenton*, the appellate court held that section 2 of the Interest Act required the board of trustees of a police pension fund to pay prejudgment interest on disability benefits which it initially denied to a police officer. *Fenton*, 203 Ill. App. 3d at 723-24. In support of its decision, the court found that the Pension Code prescribed the terms and conditions of the fund, created an indebtedness similar to bonds, bills, or promissory notes, and thus qualified as an "other instrument of writing" under section 2 of the Interest Act. *Fenton*, 203 Ill. App. 3d at 723. The reviewing courts in *Barber* and *Martino* also addressed whether prejudgment interest should be assessed against police boards that initially denied disability pensions to officers. *Barber*, 256 Ill. App. 3d at 819; *Martino*, 331 Ill. App. 3d at 983. Both courts followed *Fenton* and found that the respective officers were entitled to prejudgment interest under the Interest Act. *Barber*, 256 Ill. App. 3d at 819; *Martino*, 331 Ill. App. 3d at 983.

The Board contends that the trial court improperly imposed prejudgment interest under section 2 of the Interest Act because "the Fund" is a "public body." While the Board acknowledges the holdings in *Fenton*, *Barber*, and *Martino*, it asserts that "[t]he absence of any discussion in [those cases] of long-standing Illinois law that public bodies are not subject to prejudgment interest awards, must have resulted from the failure of the defendants [in those cases] to raise the exemption afforded public bodies from paying prejudgment interest."

■ Illinois courts have held that absent an express agreement providing for the payment of interest and absent evidence that the funds in question have been wrongfully obtained and illegally withheld[1], the State of Illinois, municipal corporations, and counties are exempt from statutes which generally allow the recovery of prejudgment interest (such as section 2 of the Interest Act) but which fail to expressly state their provisions apply to the State or the counties or

---

[1]At this point the record reflects no evidence that the funds in question in the instant case have been wrongfully obtained and illegally withheld.

municipal corporations located within it. See, *e.g.*, *Allphin*, 82 Ill. 2d at 578-79, ("[t]he failure of the legislature to specifically subject the State to liability under *** general interest statutes prevents their use as authority for assessing interest against the State" unless the funds have been wrongfully obtained and illegally withheld); *City of Pekin v. Reynolds*, 31 Ill. 529, 531-32 (1863) (municipal corporations, as well as the state and its counties, may not be required to pay interest on indebtedness unless permitted by specific legislative enactment).

In *Pekin*, the supreme court explained the rationale for exempting the state, counties, and municipal corporations from general interest statutes as follows:

"At the common law, interest was allowed in no case. [Citation.] It is the creature of the statute alone, and to it we must look for authority for its allowance. If not authorized by the statute it cannot be recovered. It seems to us that all the reasons why a State or county should not be liable for interest[ ] apply with equal force to a city or town. They are municipal bodies created for public purposes[ ] and with limited powers of taxation. And must be presumed to have exhausted all of their powers of taxation for the payment of their debts ***." *Pekin*, 31 Ill. at 532.

The Board contends that the exemption from general interest statutes applies not just to the state, municipal corporations, and counties, but applies more generally to any entity which qualifies as a "public body." The Board contends that "the Fund," not the "Board itself," is a public body and is thus exempt from the interest statute. The Board characterizes "the Fund" as "an administrative body charged with the responsibility of administering the retirement and disability benefits for Chicago firefighters and their family members." The Board cites no provisions within the Code to support this characterization, and the case which it cites, *Bowden v. Flannery*, 18 Ill. App. 2d 299, 307 (1958), does not support this characterization.

The Code provides that "a firemen's annuity and benefit fund shall be created, set apart, and maintained, for the benefit of *** firemen, their widows, children and parents," and provides that the firemen's annuity and benefit fund may be referred to as the "fund." 40 ILCS 5/6—101 (West 2000). The Code does not, however, confer upon the fund the duty or ability to administer annuity benefits. Rather, the Code gives the Board the authority to administer retirement and annuity benefits and to authorize payments from the fund. 40 ILCS 5/6—185 (West 2000) ("[t]he board shall have exclusive original jurisdiction in all matters related to or affecting the fund, including, in addition to all other matters, all claims for annuities"). In accordance with this statutory framework, the trial court ordered

the Board to pay prejudgment interest from the fund which it administers. For the reasons that follow, we conclude that neither the fund, which the Board characterizes as "an administrative body charged with responsibility of administering retirement and disability benefits for Chicago firefighters and their family members," nor the Board itself, which actually does administer the firemen's annuity and benefit fund, qualifies as a type of public body that the exemption was intended to protect.

In support of its contention that public bodies are exempt from general interest statutes, the Board cites *McKee-Berger-Mansueto, Inc. v. Board of Education of the City of Chicago*, 626 F.2d 559 (7th Cir. 1980), and *Calumet Construction Corp. v. Metropolitan Sanitary District of Greater Chicago*, 178 Ill. App. 3d 415 (1988). We recognize that the reviewing courts in *McKee* and *Calumet* declined to assess prejudgment interest against entities that did not qualify as counties or municipal corporations. However, we reject the Board's argument that application of the exemption in those cases requires application of the exemption in the instant case.

In *McKee*, the Board of Education of the City of Chicago (Board of Education) entered into a contract with the plaintiff for "construction management services for the Board's *** school rehabilitation program." *McKee*, 626 F.2d at 561. The plaintiff subsequently filed a breach of contract action against the Board of Education alleging that it failed to pay money that it owed under the contract. *McKee*, 626 F.2d at 561. The trial court granted judgment in favor of the plaintiff and ordered the Board of Education to pay prejudgment interest. *McKee*, 626 F.2d at 561, 566-67. The reviewing court in *McKee* reversed the award of prejudgment interest, stating:

> "Illinois law provides that *public bodies such as the Board of Education*, in the absence of an express agreement or authorizing statute, shall not be liable for such interest unless the relevant funds have been wrongfully obtained and illegally withheld. [Citations.] There is no showing in the record that the Board wrongfully obtained or illegally withheld the monies owed. [Citation.] What we view here is a legitimate dispute over funds allegedly owed under a contract that unfortunately resulted in a judicial action when private settlement efforts failed. We see no reason to penalize the Board for protecting the public resources and we find no justification in the record for the award of prejudgment interest." (Emphasis added.)
> *McKee*, 626 F.2d at 566-67.

In *Calumet*, the plaintiff filed a suit against the Metropolitan Sanitary District of Greater Chicago for breach of a construction contract between it and the Sanitary District. *Calumet*, 178 Ill. App.

3d at 416. On appeal, the reviewing court upheld the trial court's denial of prejudgment interest to the plaintiff and noted that it found persuasive the analysis of the prejudgment interest issue included in *McKee*. *Calumet*, 178 Ill. App. 3d at 423.

The Seventh Circuit Court of Appeals did not state in *McKee* that all public bodies are exempt from general interest statutes. Rather it stated that "public bodies *such as the Board of Education*" are exempt from general interest statutes. (Emphasis added.) *McKee*, 626 F.2d at 566. In addressing the Board's "public body" argument, we determine whether the Board or the fund administered by the Board share with the Board of Education and the Sanitary District the same type of characteristics that compelled the courts in *McKee* and *Calumet* to apply the exemption. In order to resolve this question, we find it helpful to review the reasoning articulated in support of the exemption and to determine whether the purpose underlying the exemption would be served in the instant case.

In support of its decision to exempt the Board of Education from prejudgment interest, the Seventh Circuit in *McKee* declined to assess prejudgment interest, reasoning, similar to the supreme court in *Pekin*, that it saw "no reason to penalize the Board for protecting the public resources." *McKee*, 626 F.2d at 567. The supreme court in *Pekin* declined to assess prejudgment interest against the City of Pekin, reasoning, as noted above, that municipal bodies are created for "public purposes," have limited powers of taxation, and "must be presumed to have exhausted all of their powers of taxation for the payment of their debts." *Pekin*, 31 Ill. at 532. This reasoning articulated in *Pekin* and *McKee* reflects that the purpose of the prejudgment interest exemption is to protect the financial resources of those public bodies that benefit the public at large.

The public bodies in *McKee* and *Calumet*—the Board of Education and the Sanitary District—were created to benefit the public at large. In contrast to the public bodies in *McKee* and *Calumet,* the fund and the Board in the instant case were created, not to benefit the public at large but, rather, to benefit Chicago firefighters and their family members. See 40 ILCS 5/6—174, 6—101 (West 2000). This fund consists of moneys contributed not only by the City of Chicago but also by the firemen themselves. See, *e.g.*, 40 ILCS 5/6—167 (West 2000). Indeed, the Board's statutory powers and duties include supervising deductions from the salaries of firemen paid into the fund as well as supervising contributions made by the City of Chicago to the fund. 40 ILCS 5/6—180 (West 2000). In addition, the Board's powers and duties include investing the money in the fund and authorizing payment of annuities, pensions, and benefits. 40 ILCS 5/6—183, 6—185 (West 2000).

■ We recognize the City of Chicago contributes an amount to the fund that significantly exceeds the amount contributed by the firemen. We note, however, that unlike the money in the budgets of municipal corporations and public bodies, which can be earmarked for specific expenditures that benefit the public at large, the money in the firemen's fund is invested and is used to benefit, not the public at large, but firemen and their beneficiaries. 40 ILCS 5/6—101, 6—183 (West 2000). Between the death of Mr. Nutter and the date the trial court reversed the Board's denial of duty death benefits to his widow, the Board had control over money to which Nutter was legally entitled and which formed part of a larger fund to which Mr. Nutter had made contributions in the form of deductions from his salary. Furthermore, during this interval of time, the Board had the fiduciary duty to invest this money in the fund on behalf of the firemen and their beneficiaries. See 40 ILCS 5/6—183, 1—109(a)(1), (a)(2), 1—101.2 (West 2000).

We are mindful, as the Board points out, that when a fireman is in receipt of duty disability benefits, the City of Chicago makes contributions to the fund that the duty disabled fireman would otherwise have made. See 40 ILCS 5/6—169 (West 2000). We are also mindful that Mr. Nutter was on duty disability at the time of his death. We note, however, that Mr. Nutter worked for the fire department for over 10 years prior to being awarded duty disability benefits and contributed to the fund during that time. Accordingly, denying prejudgment interest to Nutter would not serve the exemption's purpose of protecting the financial resources of public bodies that are designed to benefit the public at large.

The Board cites *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 128 Ill. App. 3d 678 (1984), to further support its contention that the Interest Act did not authorize the imposition of prejudgment interest. In *Kozak* the plaintiff widow contended on appeal that a predecessor of section 2 of the Interest Act authorized her to receive prejudgment interest on an annuity payment initially denied to her by the Board. *Kozak*, 128 Ill. App. 3d at 680-81. Although the reviewing court ultimately granted the plaintiff prejudgment interest on equitable grounds (*Kozak*, 128 Ill. App. 3d at 683), it rejected her argument that the predecessor of section 2 of the Interest Act authorized her to receive prejudgment interest. *Kozak*, 128 Ill. App. 3d at 681. The court stated it found "plaintiff's reliance on [the interest statute] to be misplaced[ ] because the statute does not specifically authorize the assessment of interest against municipalities." *Kozak*, 128 Ill. App. 3d at 681. Nowhere in its decision, however, did the reviewing court in *Kozak* define "municipality" or indicate why it believed that the Board qualified as a municipality.

We note that the appellate court subsequent to the *Kozak* decision directly addressed the question of whether the board of trustees for a police pension fund qualifies as a municipality and is therefore exempt from prejudgment interest. See *Barber*, 256 Ill. App. 3d 814. In *Barber*, the court found the Board of Trustees of the Village of South Barrington Police Pension Fund did not qualify as a municipality. *Barber*, 256 Ill. App. 3d at 819. The court observed that section 3—103 of the Pension Code defines municipality as " '[a]ny city, village or incorporated town of 5,000 or more but less than 500,000 inhabitants' " and " 'any city, village, or [in]corporated town of less than 5,000 inhabitants,' " and reasoned that the board of trustees fell outside that definition since it was not a city, village, or incorporated town. *Barber*, 256 Ill. App. 3d at 819, quoting Ill. Rev. Stat. 1989, ch. 108½, par. 3—103.

We recognize *Barber* concerned a board of trustees for a police pension fund rather than for a firemen's pension fund. However, in the instant case, we find the Board and the fund it administers on behalf of fireman no more similar to a municipality than the board of trustees in *Barber*. Indeed, Article 4 of the Code, which creates the firefighters' pension fund in municipalities of between 5,000 and 500,000 inhabitants, includes a definition of "municipality" very similar to the one relied upon by the court in *Barber*. Specifically, section 4—103 of the Code defines "municipality" as "[a]ny city, township, village or incorporated town of 5,000 or more but less than 500,000 inhabitants," "any fire protection district having any full-time paid firefighters," and "any city, village, incorporated town or township of less than 5,000 inhabitants." 40 ILCS 5/4—103 (West 2000). While the Board and fund in the instant case were created pursuant to Article 6 of the Code (which creates the firefighters' pension fund in cities with over 500,000 inhabitants), we note that Article 6 does not include a definition of "municipality," and thus we find no reason to depart from the definition of "municipality" included in Article 4 of the Code. Neither the Board nor the fund is a city, township, village, incorporated town, or fire protection district with full-time paid firefighters, and we therefore conclude that neither qualifies as a municipality exempt from prejudgment interest. Accordingly, we find the reasoning of *Barber* persuasive and decline to follow *Kozak*.

Based upon the foregoing discussion, we conclude that the trial court did not abuse its discretion by awarding prejudgment interest in the Nutter case.

### Postjudgment Interest

■ The Board next argues that the trial court erred when it

awarded postjudgment interest beginning on the dates that it entered the respective judgments. The statute governing this issue is section 2—1303 of the Code of Civil Procedure, which states in relevant part:

"Judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied or 6% per annum when the judgment debtor is a unit of local government, as defined in Section 1 of Article VII of the Constitution, a school district, a community college district, or any other governmental entity. When judgment is entered upon any award, report or verdict, interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment. Interest shall be computed and charged only on the unsatisfied portion of the judgment as it exists from time to time. The judgment debtor may by tender of payment of judgment, costs and interest accrued to the date of tender, stop the further accrual of interest on such judgment notwithstanding the prosecution of an appeal, or other steps to reverse, vacate or modify the judgment." 735 ILCS 5/2—1303 (West 2000).

Section 2—1303 of the Code of Civil Procedure "provides only one method for a judgment debtor to stop the accrual of interest, and that is by tendering payment of the judgment, costs, and interest accrued to date." *Antol v. Chavez-Pereda*, 284 Ill. App. 3d 561, 576 (1996). However, if a case is remanded by a reviewing court and the judgment debtor has no way of determining how much money he must pay to stop the further accrual of interest, interest will not accrue until judgment is entered on the verdict rendered upon remand and the exact extent of the judgment debtor's liability is resolved. *Antol*, 284 Ill. App. 3d at 576; see also *Poe v. Industrial Comm'n*, 230 Ill. App. 3d 1, 8-9 (1992).

The Board contends that the trial court's imposition of postjudgment interest was improper because its judgments "did not and could not set a definite amount of money owed to plaintiffs" but instead "remanded the matters back to the Board with directions to calculate widows' annuity benefits in accordance with the formula contained in [section 6—140 of the Code] and then pay the additional amount due to plaintiffs." Thus, the Board contends, "[i]t [was] not until the date of the Board's determination of the benefits due on remand that postjudgment interest beg[an] to accrue." In support of this contention, the Board relies on *Antol* and *Poe*.

In *Antol*, a negligence case, the jury allocated 60% of liability to one defendant, the Chicago Transit Authority (CTA), and 40% to the other defendant. *Antol*, 284 Ill. App. 3d at 565. The appellate court reversed the jury's allocation of fault and remanded the case for a new

trial on the apportionment of liability. *Antol*, 284 Ill. App. 3d at 575-76. The court in *Antol* held that judgment interest would not accrue until judgment was entered on the verdict returned upon remand and the exact extent of the CTA's liability was determined. *Antol*, 284 Ill. App. 3d at 576.

Similarly, in *Poe*, a workers' compensation case, the appellate court found that the trial court properly denied the claimant's request for interest for the period of time between the Industrial Commission's original award and its decision on remand. *Poe*, 230 Ill. App. 3d at 8-9. In support of its decision, the reviewing court noted that the trial court had remanded the case with instructions to the Commission to determine all aspects of the subject "causal connection" and that the exact amount of the employer's liability, if any, could not have been known until the Commission's decision on remand was rendered. *Poe*, 230 Ill. App. 3d at 8-9.

■ In the instant case, unlike *Antol* and *Poe*, the trial court did not remand Nutter's case because there was uncertainty with regard to the amount of damages to be awarded in favor of Nutter. Rather, the trial court remanded the case with instructions for the Board to grant Nutter a 75% duty death benefit pursuant to section 6—140 of the Code. The Board was well acquainted with this statute and thus could have calculated the amount of the duty death benefit to which Nutter was entitled (75% of her husband's salary). Unlike the judgment debtor in *Antol* and the Industrial Commission in *Poe*, the Board had the ability to determine the amount of the underlying judgment, to tender payment of that judgment to Nutter, and to thereby stop the accrual of postjudgment interest. Accordingly, as to Nutter, we conclude that the trial court's imposition of postjudgment interest did not constitute an abuse of discretion.

■ The Board lastly argues that even if plaintiffs were entitled to postjudgment interest under section 2—1303 of the Code of Civil Procedure, the trial court's imposition of a 9% interest rate was improper because "the Fund" qualifies under section 2—1303 as a "governmental entity" and was therefore subject to an interest rate of only 6%. We reject the Board's argument.

The Board does not offer a definition of "governmental entity." We believe, however, that in order to qualify as a governmental entity, an entity must perform a governmental function. Black's Law Dictionary defines "governmental function" as "[a] government agency's conduct that is expressly or impliedly mandated or authorized by constitution, statute, or other law and that is *carried out for the benefit of the general public*." (Emphasis added.) Black's Law Dictionary 704 (7th ed. 1999). The fund was not created for the benefit

of the general public, but for the benefit of firemen employed by the City of Chicago who are required by statute to contribute to that fund. As previously noted, the Board's primary statutory function is to administer a pension fund. In the context of the instant case, we find neither the Board nor the fund performed a governmental function. Accordingly, we find the Board and the fund do not qualify as "governmental entit[ies]" under section 2—1303 of the Code of Civil Procedure. We conclude the trial court did not abuse its discretion by awarding postjudgment interest at the rate of nine percent.

## CONCLUSION

For the reasons previously discussed, we affirm the circuit court's order reversing the Board's decision denying a 75% duty death benefit to Nutter. Nutter is to receive a 75% duty death benefit pursuant to section 6—140 of the Code. As to Nutter, we affirm the circuit court's order imposing prejudgment interest and postjudgment interest.

We vacate the circuit court's order reversing the Board's decision denying duty death benefits to O'Callaghan, Jelinek, and Barry, and we vacate the Board's decision denying duty death benefits to O'Callaghan, Jelinek, and Barry. We remand these cases to the Board for evidentiary hearings as to whether 75% duty death benefits should be granted to O'Callaghan, Barry and Jelinek.

Affirmed in part and vacated in part; cause remanded with directions.

FITZGERALD SMITH, P.J., and GALLAGHER, J., concur.